Good morning, honored guests. I'm your moderator, John Decker, at Skechers USA, Inc. I'm here to talk to you about a number of problems that we have here in the United States. The country is going to raise hell. I'm going to discuss several of them. This morning, I'd like to start by emphasizing two sub-genetic moral errors that have been in the court's analysis. The first is that the court enjoys competition and competition. The more people who are involved, the costlier it's going to be. And as a result of that, we will not enjoy the competition. The other important categorical point is that the court fails to analyze the preliminary judgment factors for either issue under the theory of competition and harm. Actually, it's certain opinions, to be clear. I think it's not enough to now assert any weight of self-indulgence in what you choose to cover with Skechers logos and their set of predictions. No. We can instead contend that factors crossed over to your honor were not insistent. Some of you saw them before on the screen. From a distance, you might think they are an issue because the person putting them could be very long-winded. It would obscure the differences in designs and the numerous Skechers marks that would otherwise prevent conclusion. The person seeing Skechers shoes in every context, as it is, then might draw some unspecified negative inference that undermines a case in which there is some unspecified harm. Given that theory, the first little question below was or still is, what evidence did the case produce? To show that, thus, the court immediately stopped Skechers from competing issues. The wholesale, long-distance refusal of Skechers to occur is reflected in society as it can never be compensated for money damages. Do you feel that that theory, with regard to the onyx shoes, is evidence of a survey of older information on the web page? And do you feel that expert explanations from other values, so forth, such as community expansion, or community affiliation, are needed? Well, first of all, I would like to say there is a substitution to the fact that onyx, the fact that onyx might go back to a time in the 1880s, and that the PCC did not take a survey of the onyx shoes in the onyx era as a question. So, that's very absurd of you, especially if you choose to do this now, but it's not a question of almost secondary meaning. It's the threshold point with respect to the onyx, how it reflects your confusion. It would establish, luckily or not, because that's the whole point of this first decision. Currently, we're satisfied that what's confusing is not an issue of the percentage of wearable harm at the preliminary stage. What you have to show is that there's going to be some sort of primary consequence that will be compensated for money damage. It doesn't show anything with respect to either the cross-parts or the onyx. Are you looking at wearable injury, injury to the foot, or confusion, or are they mixed? I don't think that's a problem. I understand. I don't think that's what you'll be asking. You're asking what are the benefits of using what's not to establish wearable harm in a matter of two or three days. This is where it's at an appropriate standard. But, to answer your other question, the problem was we didn't have any actual evidence of this kind of wearable harm. You know, the court, according to a specific case study, which is the type of anonymous question suggested, wearable harm would result from confusion because of what evidence indicates. But the evidence also gives employees who said they feared wearable harm. But, as this Court has said time and time again, declarations from employees hold probative value because, and I quote, a trademark law is skeptical of the ability of an associate or a trademark holder to transcend personal bonuses to transfer accounts of the value of a holder's mark. The case, therefore, cannot just allege that a situation where a state of wearable harm is actually proved to be wearable harm. That's not the case. And they did not do so. As I've mentioned earlier, the purview case requires an actual proof of wearable harm. So, why did the United States act that the party claims that they have goodwill, they have all of the emergencies, the specifics of goodwill, that the goodwill is going to be substantiated by the person whose trademark is being performed? It's a safety-distance issue. It's three stripes. It's not uncollegial. In principle, it's a tradeoff. It's not something you can choose. That's not the case in this respect. It's a tradeoff. You can get whatever state-of-the-art information you're storing. It's three stripes. You don't actually have to get this. There's some prejudice among the people who want that state-of-the-art information. There's some beliefs. That's not of our interest. But I think that, first of all, the core thing in the state of not looking at the crosswords you are talking about, the two-stripe mark, for themselves, but being seen against, there's no way that you can look at the crosswords you are, the size, the handle, the design, and see that it's just an obscured idea. And that's what the two-stripe mark is. It doesn't look like the two-stripe mark is what's cut off. You can go all the way down to those three stripes. But more importantly, if, under your theory, the problem is that it's obscured by the antitrust, the search is normally below that thickness in those three stripes. It would be more likely to be seen. It's more likely to be seen with scissors, not anything that one might think. It is the two-stripe mark all over your honor, I would say. That's all subject to critique. That's the whole point of the confer. The issue is, if you take that as a problem, then you believe that there's a bunch of things that occur out there that are subject to being tested. And that's what you need to do. You don't necessarily need to prove it all by case, of course, but you need to have evidence behind it, hypothesis behind the chart. And what is a good thing to start doing is having a hypothesis. It's the style of the card that goes from certain inferences to reasonability parameters, certain inferences to logic that are required. What are the facts that are appropriate? What's positive? What's negative? What's attractive? What do you think? What do you think? Maybe not. Not so much. Because the inference is important. But the inference is hard. That's the key here. I mean, the key here is that it's hard. And the reason why I say it's hard is because it's hard no matter where you come from. If somebody would look at it and choose, and somebody else would look at it and have a three-stripe solution, whatever the probability that I have it in the next few years, that's going to be the sales loss for a few years. That's not what I meant by hard. You know, I think you still need some evidence. But it's not a tough problem to prove. I mean, there's no sales loss. I mean, there's too much to say off the top of your head. Remember this? I mean, it's exactly what I was talking about. If the problem comes with, if you can give me that credible evidence to a three-stripe solution, they didn't have to buy it a few years. But, of course, some of the glitches may result in a future sale loss. You don't care. It doesn't make much of a difference whatsoever. That's part of the whole concern. But some factors are going to create that concern. And, below, maybe this consumer wasn't fooling. Maybe this consumer had issues with swapping some products and maybe that's why they knew it was for three years. That doesn't solve it. It's probably not. I think it's the simplest one known that that was possible. There are hundreds of consumers who say that. It's a viable solution because if I want to do this, I don't want to buy anything that already lives out on the street. If I'm zero consumers, and then I'm going to have to look at the individual consumer. What will happen to these processors? Will they serve any purpose? Perhaps, but that will be COVID-19. Is that going to become the hypothesis for our answer? I think it's a concern. It's easier for the CMEs. It seems to me the easier it is to prove. I think they're going to do much better. Maybe they could. But, they might expose those results. We don't know what the point is. That's exactly where everybody's requiring some sort of proof. Not just a posture. And that's what's tricky as well. I think that's what their theory is that a lot of their theory seems to be a hypothesis of the CME. But, this has driven this question to a lower end brand. And, we see on the streets, and there have been people who have been in the association for a few decades. Again, easily attestable. Just do the market test and see if people are actually buying things. The cost per TR is lower. But, if people physically see from a distance that you're buying things, then they would draw the bank association. There's no evidence in this matter that the CME being anywhere in the United States, thinks the cost per TR is lower quality. But, I think that's just a question. I don't know. So, you're saying that in regards to the cost per TR, at least the emission theory, that consumers who have been associated with the CME are a quality factor? Right. Yeah. It's not a point of simple confusion theory as to the cost per TR. Exactly. Well, certainly, there's some reason to think that it's certainly a confusion that just comes into play. So, I don't think that we need to limit ourselves to just negative associations ourselves. But, also, there's something out there that either way is not neutral. There's no evidence anybody talks to any kind of negative associations of seeing the shoe on the streets, thinking it's hideous. If anything, you think it's hideous, then that's a pretty good point. So, I don't think we need to limit ourselves to just the cost per TR on the obvious elements of the shoe. So, I don't think we should limit ourselves to that. Well, I think we do not see a money-over-spending in the big networks. All of a sudden, it's supposed to be that way. It's not that obvious. And, then, you have to address some of the other problems. For instance, the audience that is serving scarcity-free, but they're trying to control scarcity. The divorce is being controlled scarcely. And, then, the fact that people are wanting a decrease in productivity, a decrease in labor. Again, no food whatsoever. Easily contestable competition. And, it's inconsistent. For instance, what kind of customers they are. They're so biased about what number of shoes they had in mind out there in 2014. So, they don't know what their target was. We don't know what that was. We don't know how many other shoes were out there creating this money front. And, it's something that could have been tested. You still want to test to determine the effects on the citizens. But, it's actually not honest. It's marketing. None of the testing. It's just, as the UKs are, a free market. They're not overburdened. With respect to the funding success factors on the cost of work. Now, we've already talked about some of the things. But, you know, is it worth to hear the cost of work? I disagree. First of all, it's something that's very disconcerting. I don't approve of it. It's not because of that. It's not built up from the top to the bottom. They're not in parallel. I mean, the claimed market is parallel. They're different sizes. Up to a season's call. I think maybe there's something different from the market set. And, it's not such an obvious and difficult concession. We need to bring the competition into the shoes right now. And, that's the key. I think it's very important. It's very important to choose the cost of work here. It's about the other error. It's not the factors. The long-term theory of harm is a certain set of factors. Market insurance aren't relevant to post-self-infusion. Proximity isn't relevant to post-self-infusion. Versus retirement is, of course, the issue here. It's relevant to post-self-infusion. I think the similarity, again, with talent here is, when you say the mark, in the average wearer's shoes are filled with marks. That's what shoes look like. Lots of different styles of design. Usually, you sort of saw the distance. It's all the more difficult to pick up a hoodie that's a T-straight design or a T-six-five-straight design. It's something else to say that that mark is significant. It's not there. It's not there when you're competing with the design that's on the second part. It's all the more difficult with respect to it. I think you see it from a distance. It's hard to make sure. You can't even tell how many steps you're on and you're still a little closer. It's a great place to be. If you're here for about a minute, you can continue where we sort of found you. I'm sorry. We don't have time for it. Hold on. I know you're recording. I'll just get that. I know you're recording. Okay. Can you hear me? Yes, I can hear you. I can hear you. Okay. Thank you. Thank you. Hi, there. My name is Charlie. I'm here with another case. Before addressing you, if you can access the card and it's in your hands, which is right this side of the frame, so that you don't have to worry about it, I think it's very important to be able to do it. The card is in the same context that brings you to this meeting. Here's your option. It's on the right. It's on your right-hand side. Now, this is a case where you're in a different court and you have to go back to the front. You have to go back to the court and get the law. In this case, it was a court-appointed record. The court received 12 sworn declarations. And that's two transcripts. That's what I just declared that the court granted. The court held a five-month hearing, and while I was working there, the irreparable harm has to be a cross-correction in this case. It's also stated in the first clause. So, our case on the theory of irreparable harm, and I think it's also important for us to use two terms, the inverse of irreparable harm, and this gives me a percentage of evidence of irreparable harm in several ways. I think we have two major orientations below, and a cross-examination below. So, we're going to go through those orientations in a couple of different ways. First, there's the supplemental Bain declaration, which is our 4-6-4-7-1. Mr. Bain walks through four specific examples of irreparable harm that would occur from such a simple definition. He said he used the use of speech to control consumer interaction at the interception of his friends. He said he used the use of control over the topic of policy decisions that he's invested in. He used the use of control over his unique messaging for getting in trouble. He used the use of speech to change self-image and market place. And he said, he said there's a ton of different ways that consumer-related speech can be used to influence behavior. Mr. Bain is a marketing professional with serious experience. Let's work for it. What's very interesting to understand, remember, after all of the forms of practice issues were solved, and remember these irreparable harms that we see, lost sales, or other quantifiable losses, the very definition of irreparable harm in these frameworks is damaged or inappropriate. This court said, I think you're wrong. I think you're wrong. I think you're wrong. I think you're wrong. I think you're wrong. I think you're wrong. I think you're wrong. Also, the consumer looks exactly based on the cost questions and the belief that the need is associated itself with a lower brand or lower value shoe. And so therefore, there's a lot of irreparable harms that's been demonstrated because the state actually asserts that anyone who has lost control in the installation that he's looking at is not stating enough lower qualities in the shoe market. So, in the declaration, he talks about calling the consent of products as a result of this question of succession of qualities that do depend on consumers and marketing and surveying and grants of employees, however those that need employee distinction and brand marketing experience. And, this court justified that consumers perceive ideas as premium brand and consumers perceive centers as lower brand. And that the consumer's whole mix of associations. Now, you may think that that testimony is somehow speculative or it was a misunderstanding that this is personal knowledge, but there is no traditional following towards the general self-serving statement of quality of shoe in the U.S. law in response to the first judgment and that is that consumers are not bound by services that may be serving them as consumers but we are not bound by consumers but we are  bound by that may be serving  as consumers but we are not bound by  that may be serving we are  bound by that may
judges: O'scannlain, Clifton, Nguyen